PJS:GMT:kas

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KENNETH MURCHISON,** | : | No. 3:CV-11-2285 |
| **Plaintiff** | : | |
| | : | **(Judge Brann)** |
| **v.** | : | |
| | : | **(Magistrate Judge Blewitt)** |
| **WARDEN B. A. BLEDSOE, et al.,** | : | |
| **Defendants** | : | **Filed Electronically** |

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants B. A. Bledsoe, J. E. Thomas, K. Pigos, K. Metzger, J. Sherman, J.

Seeba, L. Potter and EMT McClintock hereby submit the following statement of

material facts in support of their motion for summary judgment.   Plaintiff, Kenneth

Murchison, is advised that pursuant to Local Rule 56.1, all facts set forth in this

statement will be deemed admitted unless controverted by Murchison with

references to the record supporting his position.

### Administrative Remedies

1.     A review of the SENTRY computer generated Administrative Remedy

Generalized Retrieval was performed on December 18, 2012.   (Declaration

of Michael S. Romano (Ex. 1) ¶ 6; Attach. B).

2.     The results revealed Plaintiff has filed 123 remedies.   (Id.)

3.    The search was then limited to May 1, 2011 through December 17, 2012, and remedies filed at the national level (reflected by an "A" in the Remedy level field on the cover/search parameters filed).   (Id.)

4.    The search yielded 36 results.   A review of the results revealed 31 of the remedies filed at the national level were rejected.   (Id.)

5.    The following remedies were not rejected but pertained to different issues: Remedy No. 645058-A2 (page 4):   the abstract field reflects the issue addressed pertained to his placement in the SMU program (denied). (Id.)

6.    Remedy No. 648317-A1 (page 8):   the abstract field reflects the issue addressed pertained to a DHO challenge. (denied)   (Id.)

7.    Remedy No. 674215-A2 (page 14):   the abstract field reflects the issue addressed pertained to legal mail (denied)   (Id.)

8.    Remedy No. 682886-A1 (page 16):   the abstract field reflects the issue pertained to a request to be placed in a state correctional facility (still pending) (Id.)

9.    Remedy No. 701379-A1 (page 17):   the abstract field reflects the issue addressed a challenge to being placed in the SMU program. (Id.)

**Background of Allegations**

10.    Plaintiff has an extensive disciplinary history that includes fighting, threatening bodily harm, assault, setting a fire, possession of a weapon and

possession of intoxicants.   (Romano Decl. (Ex. 1) ¶ 7; Attach.C.)

**May 16, 2011**

11.   Murchison arrived at USP Lewisburg on May 16, 2011.   (<u>Id.</u> ¶ 8; Attach. D.)

12.   He became disruptive directly upon his arrival (approx. 4:10 pm) when staff was removing Murchison's hand restraints when he pulled away from staff in an aggressive manner causing injury to the staff member's hand.   (<u>Id.</u>)

13.   Murchison then refused to submit to hand restraints and threatened staff. (<u>Id.</u>)

14.   The Warden was contacted due to Murchison's disruptive behavior and displays of imminent violence. (<u>Id.</u>)

15.   Warden Bledsoe authorized a use of force team to be assembled to place Murchison in ambulatory restraints. (<u>Id.</u>)

16.   At approximately 5:17 pm the use of force team was assembled and confrontational avoidance procedures were initiated with positive results as Murchison then submitted to hand restraints.   (<u>Id.</u> ¶ 9; Attach. D-E.)

17.   As Murchison was removed from the cell he intentionally threw himself on the floor and refused staff orders to walk.   (Id.)

18.   Prior to placement on a gurney Murchison was searched and put into new clothing. (<u>Id.</u>)

19.   Murchison continued to threaten staff and resist being transported.   (<u>Id.</u>)

20.   He bit one staff member and spat on another while being moved on the

gurney.   (Id.)

21.   The team placed Murchison on the floor to regain control of him.   (Id.)

22.   The Operations Lieutenant was notified of the situation and authorized
      Defendant Lt. Seeba to place Murchison in four point restraints. (Id.;
      Declaration of Jason Seeba (Ex. 2.) ¶ 4; Attach. A.)

23.   Murchison was then moved to cell #24 in the basement of Z-Block and placed
      in 4 point restraints. ((Ex. 1.) ¶ 9; Attach. D-E.)

24.   He was then medically assessed by Defendant EMT Potter who noted in his
      encounter notes that Murchison was resisting the team and would not answer
      questions.   (Declaration of L. Potter (Ex. 3) ¶ 2; Attach. A.)

25.   Radial pulses were noted as regular; blood glucose level was noted as 168.
      No signs of trauma were noted. ((Ex. 3.) Attach. A.)

26.   Warden Bledsoe's role in this incident was limited to authorizing the use of
      force team to be assembled and to place Murchison in restraints for reported
      threats of imminent violence. ((Ex. 1.) ¶ 8; Attach. D.)

27.   Defendant Lt. Seeba was the Use of Force Team Lieutenant.   ((Ex. 2.)
      Attach. A.)

28.   Defendant EMT/Paramedic Potter was the medical provider who assessed
      Murchison following the incident.   (Declaration of L. Potter (Ex. 3.) ¶ 2;
      Attach. A.)

29.   Two Incident Reports (IR #2163627 and IR #2163617) were written by staff who are not defendants in this case.   ((Ex. 1.) ¶ 10; Attach. F.)

30.   No good conduct time was taken in either instance.   (Id.)

31.   An after action review of the incident was performed by reviewing officials who are not defendants in this case.   (Id. ¶ 11; Attach. G.)

32.   The review concluded that the use of force/restraints were reasonable and appropriate.   (Id.)

33.   Plaintiff was only in restraints from 5:20 pm on May 16, 2011 through 2:00pm on May 18, 2011 (less than 48 hours).   (Id.)

**May 17, 2011**

34.   The Operation's Lieutenant and the on duty Paramedic (Defendant L. Potter) were checking Murchison's restraints at approximately 12:00am.   (Id. ¶ 12.)

35.   Potter was checking the restraints when Murchison spat in his face and became verbally aggressive.   (Id.)

36.   Staff exited the cell and re-entered with a shield. (Id.)

37.   Murchison is a diabetic and Potter checked his blood glucose level which was noted as 224.   (Id.; Attach. H-I.)

38.   Potter wrote Plaintiff an incident report for assault and threatening (IR No. 2163807).   ((Ex. 1.) ¶ 13; Attach. J.)

39.   No good conduct time was taken from Murchison as a result of the incident

report. (Id.; Attach. C.)

40.    The 15-minute checks were completed and documented while Murchison was

        in restraints May 16-17, 2011.   ((Ex. 1.) Attach. K.)

41.    A review of the Two Hour Lieutenant check records for May 16-17, 2011,

        reveals Defendant Lt. Seeba only checked Murchison's restraints one time.

        ((Ex. 1.) ¶ 14; Attach. L.)

42.    Seeba checked the restraints on May 17, 2011, at 8:00 pm, his notes indicate

        Murchison refused to use the toilet and refused the offer of water. (Id.)

43.    Seeba also noted that Murchison stated "I don't want nothing from you

        cracker" and that he was still agitated with a poor attitude.   (Id.)

44.    A May 16, 2011, 8:00 pm check by a lieutenant who is not a defendant in this

        case, noted that Murchison drank 8 oz. of water, was still in an agitated state

        and stated he is not afraid to kill people.   (Id.)

45.    A May 16, 2011, 10:00 pm check by a lieutenant who is not a defendant in this

        case, noted that Murchison drank 8 oz. of water and ate one sandwich.   (Id.)

46.    It was also noted that Murchison stated this place is fucked up and he still had

        a bad attitude.   (Id.)

47.    A May 17, 2011, 2:00 am check by a lieutenant who is not a defendant in this

        case, noted that Murchison continued to threaten all staff with bodily harm.

        (Id.)

48.   Murchison also threatened to find staff after he was released and kill them.
(Id.)

49.   He also noted that water was offered and refused. ((Ex. 1.) ¶ 14; Attach. L.)

50.   Other entries of May 17, 2011 by other lieutenants reflected a continued poor
attitude and aggressive behavior by Murchison.   (Id.)

51.   A May 17, 2011, 4:00 pm entry reflected Murchison drank 8 oz. of water and
ate one sandwich. (Id.)

52.   He drank 8 oz. of water at 6 pm and refused water/toilet at 8 pm.   (Id.)

53.   On May 18, 2011, Murchison was downgraded to ambulatory restraints at
9:00 am. (Id.)

54.   A 2 pm entry reflects Murchison regained control and was released from
restraints.   (Id.)

**June 17, 2012**

55.   On June 17, 2012, Murchison and his cell mate refused to return their food
trays and displayed imminent violence by threatening to assault each other or
kill staff if they were not immediately removed from their cell and separated.
((Ex. 1.) ¶ 15; Attach. M; Declaration of J. Sherman (Ex. 4.) ¶ 2; Attach. A.)

56.   Warden Thomas was notified and he authorized a use of force team to be
assembled and to place both inmates in ambulatory restraints.   (Id.)

57.   At approximately 7:44 am, a use of force team was assembled and

confrontation avoidance procedures were initiated with positive results.   (<u>Id.</u>; (Ex. 4.) ¶ 3; Attach. A.)

58.   Defendant Lt. Sherman was the use of force Lieutenant. (<u>Id.</u>)

59.   Defendant Metzger was the confrontational avoidance person and had no role in physically moving Murchison. ((Ex. 1.) ¶ 15; Attach. M; Declaration of K. Metzger (Ex. 5.) ¶ 3; Attach. A.)

60.   Murchison was removed from the cell, searched, placed in new clothes, medically assessed and put into ambulatory restraints.   (<u>Id.</u>)

### <u>Video</u>

61.   A review of the video reveals Murchison submitted to restraints. ((Ex. 1.) ¶ 15; Attach. N.)

62.   The Use of Force Team escorted him to the shower area (Murchison walked on his own), searched him and changed him into new clothes and he was medically assessed. (<u>Id.</u>)

63.   While waiting to be moved to a cell Murchison complained that the belly chain was excessively tight and that he couldn't breathe. (<u>Id.</u>)

64.   Murchison can be heard talking at length without any indication of difficulty breathing or talking.   (<u>Id.</u>)

65.   Murchison repeatedly stated that his rights were being violated while being placed in restraints and while being escorted, threatened to sue everyone.

(Id.)

66.    The Team then escorted him to D Block, cell 101 (again, Murchison walks on

his own), placed him in the cell on the lower bunk.   The team can then be

seen exiting the cell.   ((Ex. 1.) ¶ 15; Attach. M-N; (Ex. 4.) Attach. A; (Ex. 5.)

Attach. A.)

67.    Murchison was written an incident report for Interfering with a security

device; threatening; and refusing an order (IR #2316445).   ((Ex. 1.) ¶ 16;

Attach. C, O.)

68.    A Disciplinary Hearing was later held with no good conduct time being taken.

(Id.)

69.    Murchison was in restraints from 8:15am on June 17, 2012 through June 18,

2012 at 9:30am (a little over 24 hours).   ((Ex. 1.) ¶ 17; Attach. P.)

70.    He was medically assessed following the incident and regular checks were

made by health care providers throughout the time he was in restraints. ((Ex.

1.) ¶ 17; Attach. P-Q; Declaration of Kevin Pigos, M.D. (Ex. 6.) ¶ 13; Attach.

K.)

71.    None of the defendants performed health care checks.   ((Ex. 1.) ¶ 17; Attach.

Q.)

72.    Regular 15 minute checks were made by staff and regular two hour checks

were made by a lieutenant.   (Id.; Attach. R-S.)

73.   An after action review was performed and concluded the use of force/restraints was reasonable and appropriate. (Id.; Attach P.)

74.   BOP Program Statement 5566.06, <u>Use of Force and Application of Restraints</u> and related CFR parts provide the policy for use of force and application of restraints.   ((Ex. 1.) ¶ 18; Attach. T.)

75.   "Staff are authorized to apply physical restraints necessary to gain control of an inmate who appears to be dangerous because the inmate: a.) assaults another individual; b.) destroys government property; c.) attempts suicide; d.) inflicts injury upon self; or e.) becomes violent or displays signs of imminent violence." (Id.; Attach. T at 1.)

76.   The policy also provides that there are two types of use of force:   immediate use of force and calculated use of force.   (Id.; Attach. T at 3-4.)

77.   Policy provides that a calculated use of force is appropriate when an inmate is making verbal threats.   (Id.)

78.   Principles governing the use of force and application of restraints: Policy provides that an appropriate amount of force may be warranted to situations (not limited to) that are necessary to enforce institutional regulations.   (Id.; Attach. T at 6.)

**<u>Progressive and ambulatory restraints</u>**

79.   Policy also provides that "progressive restraints are defined as the process of

using the least restrictive restraints method to control the inmate as deemed

necessary for the situation." (Id.; Attach. T at 11.)

80. "Based on the inmate's behavior, more restrictive restraints may be used."

(Id.)

81. Policy further provides that if an inmate is placed in restraints for a prolonged

period that "staff should look for a pattern of non-disruptive behavior over a

period of time as an indication that the inmate has regained self-control and is

no longer a disruptive threat." (Id.; Attach. T at 11.)

82. "The 15 minute and two hour logs should be reviewed to support any decision

concerning the release of an inmate in restraints." (Id.)

83. In situations where the need for more restrictive or secure restraints is

necessary "i.e. the inmate's behavior becomes increasingly aggressive and

disruptive, staff must determine the type of restraints to be used", including

the use of four point restraints. (Id.)

84. "In situations involving highly assaultive and aggressive inmates, progressive

restraints should be used only as an intermediate measure in placing the

inmate in or removing an inmate from four-point restraints." (Id. at 12.)

85. Inmates in four-point restraints will be checked by a lieutenant every 2 hours

to determine if the inmate has regained a pattern of non-disruptive behavior

over a period of time that would indicate the inmate has regained self-control

and is no longer a disruptive threat.   (Id.; Attach. S.)

86.   The lieutenant should review the 15 minute and two hour log checks when making the determination as to whether the inmate has regained a pattern of self-control and may be released from restraints.   (Id. at 13; Attach. R-S.)

87.   During the two hour checks "the inmate will be afforded the opportunity to use the toilet, unless the inmate is continuing to actively resist". (Id.; Attach. S.)

## May 27, 2011-June 17, 2012 Diabetes Medication

88.   Murchison has several medical conditions that include antisocial personality, hypertension, hepatitis and diabetes, type II.   (Declaration of Kevin Pigos, M.D. (Ex. 6.) ¶ 2; Attach. A.)

89.   One of Plaintiff's complaints related to his diabetic condition includes polyneuropathy which is a neurological disorder that occurs when many nerves throughout the body malfunction at the same time.   (Id. ¶ 3.)

90.   It can be present in a diabetic regardless of how well the diabetes is controlled. (Id.)

91.   Associated pain can be present anywhere body but is frequently more common in the lower extremities. (Id.)

92.   Treatment includes medication, exercise, and diet. Pain can be treated with medications such as Gabapentin.   (Id.)

93.   Plaintiff was seen by Dr. Pigos in a Chronic Care Clinic on May 27, 2011, and
      Plaintiff's chief complaint was related to pain he was experiencing in his left
      lower extremity.   (Id. ¶ 4; Attach. B.)

94.   Plaintiff indicated he had a tingling and burning sensation that was occurring
      for a period of time since having been diagnosed with diabetes.   (Id.)

95.   Plaintiff was examined and his A1C levels were grossly elevated indicating
      his diabetes was not well controlled.   (Id.)

96.   Pigos noted that his related polyneuropathy may become more controlled as
      the control of his diabetes improved.   (Id.)

97.   Murchison was prescribed insulin to treat his diabetes and Gabapentin for his
      related pain, which was initially prescribed at 900 mg/ twice a day. (Id.)

98.   Pigos chose this dosage level due to it having the best rate of bioavailability,
      i.e. the highest percentage of active compound delivered to the tissues. (Id.)

99.   The Plaintiff was seen on July 20, 2011, by a physician assistant (PA).   (Id. ¶
      5; Attach. C.)

100.  Plaintiff indicated he had an increase in neuropathic pain since his medication
      was decreased.   (Id.)

101.  The administrative note reflects the PA increased the dose of Gabapentin
      from 900 mg to 1200 mg, twice a day.   (Id.)

102.  Plaintiff was again seen on August 8, 2011, by a PA and he requested to have

13

the dosage of Gabapentin increased to 1800 mg.   (Id. ¶ 6; Attach. D.)

103.   The PA discussed the associated risks with increasing the dosage to such a high level and Murchison said he would be willing to accept the risk.   (Id.)

104.   It was noted that the Plaintiff is a large man (300 + lbs).   The dosage was increased to 1200 mg each morning and 1800 mg each evening and Dr. Pigos co-signed the order.   (Id.)

105.   On November 3, 2011, a registered nurse noted that Plaintiff's blood sugar level had improved slightly since the last draw.   (Id. ¶ 7; Attach. E.)

106.   Plaintiff's prescription for Gabapentin, 1200 mg in the morning and 1800 mg in the evening, was re-filled on November 30, 2011.   (Id. ¶ 8; Attach. F.)

107.   Plaintiff was seen by Dr. Edinger for his chronic care clinic on December 5, 2011.   (Id. ¶ 9; Attach. G.)

108.   Murchison's weight was noted at 285 lbs. (a decrease in weight) but at that weight he was still considered obese.   (Id.)

109.   It was also noted that his diabetes, blood pressure, and weight were not well controlled and Dr. Edinger recommended a more aggressive exercise program aimed at weight loss.   (Id.)

110.   Murchison's medication was renewed by a PA on March 7, 2012, he was continued on Gabapentin at 1200 mg in the morning and 1800 mg in the evening.   (Id. ¶ 10; Attach. H.)

111.   On March 27, 2012, Dr. Edinger reviewed Murchison's diabetes and hepatitis treatment with him.   (Id. ¶ 11; Attach. I.)

112.   Murchison's weight was noted at 303 lbs. and his blood sugar was elevated. Dr. Edinger increased the Gabapentin dosage to 1800 mg, 2x/day.   (Id.)

113.   An administrative note dated May 17, 2012, by Dr. Edinger reflects that Plaintiff's insulin dosage was adjusted due to elevated blood sugar levels. (Id. ¶ 12; Attach. J.)

114.   A registered nursed noted on June 17, 2012, that Plaintiff refused his morning insulin and medication.   (Id. ¶ 13; Attach. K.)

115.   Plaintiff has been treated for his diabetes including his neuropathy.   The treatment regimen has included Gabapentin for Plaintiff's pain.   (Id. ¶ 14.)

116.   Gabapentin was chosen in part because Plaintiff reported taking it when he first arrived at the institution.   (Id.)

117.   Clinically, Gabapentin is strongly recommended as a medication for treatment of diabetic neuropathy.   (Id.)

118.   The lower dose was initially chosen due to the high percentage of active compound being delivered to the tissues as compared with other doses.   (Id.)

119.   Although there is clinical evidence of higher bioavailability of Gabapentin at 900 mg, 2x/day, the Plaintiff repeatedly requested it be increased.   (Id.)

120.   It is now at the maximum dose of 1800 mg/2x day.   (Id.)

121.   Murchison continues to be treated for his diabetes and related neuropathy.

His obesity is a factor that aggravates his overall diabetic condition.   (<u>Id.</u> ¶

15.)

                                                   Respectfully submitted,

                                                   PETER J. SMITH
                                                   United States Attorney

Date: April 19, 2013

                                                 <u>s/ Michael Thiel</u>
                                                 Michael Thiel
                                                 Assistant U.S. Attorney
                                                 PA 72926
                                                 Kimberly A. Stevens
                                                 Paralegal Specialist
                                                 228 Walnut Street
                                                 P.O. Box 11754
                                                 Harrisburg, PA 17108-1754
                                                 Phone: (717)221-4482
                                                 Facsimile: (717)221-2246

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KENNETH MURCHISON,** | : | **No. 3:CV-11-2285** |
| **Plaintiff** | : | |
| | : | **(Judge Brann)** |
| **v.** | : | |
| | : | **(Magistrate Judge Blewitt)** |
| **WARDEN B.A. BLEDSOE, et al.,** | : | |
| **Defendants** | : | **Filed Electronically** |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That on April 19, 2013, she served a copy of the attached

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Harrisburg, Pennsylvania.

ADDRESSEE:
Kenneth Murchison
06500-059
USP-Lewisburg
PO Box 1000
Lewisburg, PA   17837

s/ Kimberly A. Stevens
Paralegal Specialist